**In re Roger Dale JOHNSON, Jr. and Threesa A. Johnson, Debtors.**

No. 6:11–bk–75642.

United States Bankruptcy Court,
W.D. Arkansas,
Hot Springs Division.

Oct. 10, 2012.

Kathy A. Cruz, Hot Springs, AR, Joel G. Hargis, Jonesboro, AR, for the Debtors.

J. R. "Dick" Buzbee, Little Rock, AR, for Pamela R. Buck.

Jack W. Gooding, Texarkana, TX, Chapter 13 Standing Trustee.

## ORDER SUSTAINING OBJECTION TO CONFIRMATION OF PLAN

RICHARD D. TAYLOR, Bankruptcy Judge.

Before the court is a *Chapter 13 Narrative Statement of Plan* ("Plan") filed by Roger Dale Johnson, Jr. and Threesa A. Johnson, the debtors ("debtors"), and an *Objection to Confirmation of Plan* ("Objection") filed by Pamela R. Buck ("Buck"). The parties tried the Plan and Objection on July 6, 2012. Both parties asked to file post-trial briefs. The briefing schedule concluded on August 24, 2012. Thereafter, the court took the matter under advisement. The dispute centers on whether certain obligations, primarily post-petition real property taxes, under a contract for the sale of real property survived a previous bankruptcy, a confirmed plan, payment according to the terms of that plan, and the debtors' subsequent discharge. For the reasons stated below, the Objection is sustained. The debtors shall have thirty days from the entry of this order within which to file an amended plan. Should they choose not to do so, an order to show cause why this case should not be dismissed will issue.

### I. Jurisdiction

This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding under 28 U.S.C. § 157(b)(2)(L). The following order constitutes findings of fact and conclusions of law in accordance with Federal Rules of Bankruptcy Procedure 9014 and 7052.

### II. Findings of Fact

#### A. Note and Contract of Sale

On July 27, 1998, the debtors executed a *Promissory Note* ("Note") in favor of Buck in the amount of $26,500.00. (Buck Ex. 5 at 1.) Payments of $286.85 per month were to commence on August 31, 1998, and continue "until the entire amount of principal and interest have been paid in full." (Buck Ex. 5 at 1.) The Note recites that it "is given in conjunction with a Contract of Sale of Real Estate dated July 27, 1998," for real property located in Hot Spring County, Arkansas. (Buck Ex. 5 at 1.) This real property is the debtors' principal residence.

The *Contract of Sale of Real Estate* ("Contract") provides in pertinent part:

During the time that Buyers are in possession of the above described property under this Contract, Buyers shall pay all taxes and special assessments upon said lands. Real property taxes shall be paid by placing into escrow with Seller the sum of NINE DOLLARS ($9.00) per month at the present time. In the event, of an increase in taxes, BUYERS shall be responsible for the increase and shall be notified by SELLER of such increase.

(Buck Ex. 6 at 2.) Further,

[n]ow, upon the payment of said payments when due and payable, and all legally assessed taxes becoming due and payable in accordance with this contract, Seller, ... will convey to the Buyers, the land ... by a Warranty Deed[.]

(Buck Ex. 6 at 3.)

### B. The 2005 Case

The debtors have filed three previous bankruptcy cases. Relevant to the current case is one filed on February 18, 2005, case number 6:05–bk–71177 (the "2005 Case"). In the 2005 Case, the debtors listed their interest in the home as "own[ed]" with a secured claim of $11,000.00. (Buck Ex. 3 at 1.) The debtors listed Buck as a secured creditor on Schedule D. (Buck Ex. 3 at 8.) In the "Nature of Lien" category, the debtors responded "Purchase Money." (Buck Ex. 3 at 8.) Under "Collateral," the debtors stated, "4–bdrm house & 2.9 acres." (Buck Ex. 3 at 8.)

The debtors exempted the real property on their Schedule C. (Buck Ex. 3 at 6.) The debtors did not list the Contract as executory on their Schedule G. (Buck Ex. 3 at 15.)

The debtors' Schedule J in the 2005 Case does not reflect a home mortgage payment. (Buck Ex. 3 at 18.) Incongruently, the debtors' Schedule J does disclose that real property taxes are not included in the omitted figure. (Buck Ex. 3 at 18.) Schedule J does reflect a $17.75 per month payment for "RE & PP taxes & tag," referencing real property and personal property taxes.[1] (Buck Ex. 3 at 18.)

Buck filed a proof of claim ("2005 Claim") in the 2005 Case. The 2005 Claim is unclear. It reflects a "[m]oney loaned" debt of $22,120.32. (Buck Ex. 1.) This amount is presumably based on the Note, but the 2005 Claim references an October 21, 2002 "court judgment" as having been "obtained." (Buck Ex. 1.) Other than this reference, neither side presented any evidence explaining how the "judgment" figured into the 2005 Case. The "judgment" is not attached to the 2005 Claim. The Note, but not the Contract, is attached to the 2005 Claim. (Buck Ex. 1.)

The 2005 Claim categorizes the debt as secured and collateralized by real property. (Buck Ex. 1.) Buck left blank the space on the 2005 Claim for arrearages at the time the case was filed. (Buck Ex. 1.) She testified that the 2004 real property taxes were not owed at the time the debtors filed their 2005 Case[2] and that her 2005 Claim included only principal and interest. She also stated that the 2003 taxes were the last real property taxes paid by the debtors.

Buck objected to confirmation of the debtors' plan in their 2005 Case. (Stip. Ex. 1.) The court takes judicial notice that the debtors' initial plan in the 2005 Case characterized and proposed the following treatment of Buck's claim:

---

1. The "tag" reference was not defined but, in context, may refer to a vehicle license fee.

2. The debtors filed in February of 2005, but Buck did not receive the 2004 tax assessment until March of 2005.

## III. SECURED DEBTS WHICH WILL NOT EXTEND BEYOND THE LENGTH OF THE PLAN:

Secured creditors who will retain their liens and be paid the value of their collateral or the amount of their debt, WHICHEVER IS LESS, shall be paid as follows:

| Creditor | Debt | Value | Interest Rate* | Monthly Payment |
|---|---|---|---|---|
| Buck, Pamela | $11,000.00 | $35,000.00 | 0.00% | $305.56 Avg. |

* If this space is left blank, no interest is to be paid.

(Ch. 13 Plan Narrative Statement of Plan 2, Mar. 4, 2005, ECF No. 13.)

In her objection to the 2005 proposed plan, Buck recited that she maintained "a security interest in [the] Debtors['] home." (Stip. Ex. 1 at 1.) She further argued that the "proposed plan fail[ed] to provide for the curing of arrearages" (but set out no specified amount), accrual of interest, and the full amount of the debt. (Stip. Ex. 1 at 1.) Buck withdrew her objection based on an April 25, 2005 order that provided that the debtors would "amend their plan within twenty days to provide [Buck's] claim [as] fully secured in the amount of $22,120.32 with interest at the rate of 8% per annum." (Stip. Ex. 2.)

The debtors, on April 26, 2005, modified their plan accordingly. Specifically, their *Modification of Chapter 13 Plan* ("Modification") states:

1. That Debtors will modify their original Chapter 13 plan to accept creditor Pamela Buck's Proof of Claim in the amount of $22,120.32, to be paid through the plan on a pro rata basis. This amount will be paid with 8% interest, per the proof of claim.

2. That the length of the plan will be sixty months.

3. That Debtors will increase their monthly plan payment from $375.54 to $508.54.

4. All other provisions of the plan shall remain unchanged.

(Buck Ex. 2 at 1.)

On the same day that they filed the Modification, the debtors also modified their Schedule J, again omitting the home mortgage expense but repeating the real property tax references. (Buck Ex. 2 at 6.) The court confirmed the plan, as modified, by its *Order Confirming Chapter 13 Plan* entered on June 3, 2005. (Stip. Ex. 4.)

The court, on July 21, 2010, entered its *Discharge of Debtor After Completion of Chapter 13 Plan* pursuant to 11 U.S.C. § 1328(a). (Stip. Ex. 5.) On November 8, 2010, Jack W. Gooding, the Chapter 13 Standing Trustee, submitted his *Chapter 13 Standing Trustee's Final Report and Account* reflecting that Buck had been paid $22,120.32 in principal and $4,885.34 in interest. (Buck Ex. 4 at 1–2.)

The 2005 Case lasted approximately five years. Mrs. Johnson testified that she thought the taxes were being paid with their payments under the plan. At the conclusion of their 2005 Case, Mrs. Johnson contacted Buck and requested a warranty deed to the property. Mrs. Johnson testified that Buck informed her that she would deed the property only after the payment of back taxes and attorney's fees.

### C. The 2011 Case

#### 1. Filing

The debtors did not pay the accumulated taxes and attorney's fees. Consequent-

ly, in December of 2011, Buck revived a proceeding in the Circuit Court of Hot Spring County, Arkansas, Case No. CV–2002–194–1 (the "State Court Litigation"). (Debtor's Ex. 1.) Buck's counsel sent the debtors a *Notice* that informed them of a hearing scheduled for January 4, 2012, in the Circuit Court of Hot Spring County, "regarding the continuation of and completion of the Court ordered Commissioner's Sale of the [debtors' home]." (Debtor's Ex. 1 at 1.) This Notice caused the debtors to file their 2011 bankruptcy proceeding ("2011 Case") on December 30, 2011.

### 2. The Schedules

Mrs. Johnson testified that receipt of the Notice reviving the State Court Litigation precipitated the filing of the debtors' current Chapter 13 case. No other reason for the filing exists. The court takes judicial notice of the schedules filed in the 2011 Case. The only real property listed by the debtors is their residence, which they again schedule as "own[ed]" but free and clear of any lien or encumbrance. (Schedules 1, Feb. 23, 2012, ECF No. 15.)

The debtors listed Buck on their Schedule F as an unsecured creditor for "Notice Only" purposes. (Schedules 11, ECF No. 15.) Next to her name, they included the following statement:

> The debtor(s) dispute that the party designated herein is the actual holder of the underlying debt instrument allegedly secured by the subject collateral and reserve the right to challenge the secured status of any party who claims to be a secured creditor and a holder of any such instrument as of the petition date.

(Schedules 11, ECF No. 15.) Though the debtors did not list Buck as a secured or unsecured creditor holding a disputed claim, they did mark the "Notice Only" designation as disputed. (Schedules 11, ECF No. 15.) On their Schedule B, the debtors made a general reference to a "possible claim against Pamela Buck" of "[u]nknown" value. (Schedules 4, ECF No. 15.)

The debtors did not list any executory contracts or unexpired leases. (Schedules 14, ECF No. 15.) The debtors reported no secured creditors and thirteen unsecured creditors aggregating $13,335.71. (Schedules 13, ECF No. 15.) On their Schedule J, the debtors omitted any rent or home mortgage payment but inexplicably stated that the omitted figure did include real property taxes and property insurance. (Schedules 18, ECF No. 15.) The debtors did not list any specific amount for real property taxes. The debtors are not paying real property taxes as they continue to accrue.

The debtors exempted all of their personal and real property including their home, which they still do not hold in fee or otherwise by deed. (Schedules 6, ECF No. 15.)

### 3. Proof of Claim

Buck filed a proof of claim ("Proof of Claim") in the 2011 Case. (Buck Ex. 9.) Buck asserts a secured claim in the amount of $6,827.31 that is denoted as arrearages or other charges, including interest. (Buck Ex. 9 at 1.) The basis for the claim is "MONEY LOANED." (Buck Ex. 9 at 1.) Buck checked as collateral the "Real Estate" box. (Buck Ex. 9 at 1.) The promissory note attached is the same Note attached to the 2005 Claim. (Buck Ex. 9 at 8–9.) The Contract is also attached. (Buck Ex. 9 at 10–13.)

The claim figure of $6,827.31 is broken down into three components: first, $3,506.68 in real property taxes for the years 2004 through 2010 on which Buck accrued $1,186.23 in interest at 8% from the due date (suggested as March 1 of the year following each tax year) for a total of

$4,692.91; second, attorney's fees to C. Walthall in the amount of $1,125.28 for the State Court Litigation[3]; and third, attorney's fees of $1,009.12 to Buck's current bankruptcy counsel, J.R. Buzbee. (Buck Ex. 9 at 5.) The itemization references the 2005 Case, stating "[d]uring the previous bankruptcies, the debtor has paid off the principal but has not paid the real property taxes which have been paid by the creditor." (Buck Ex. 9 at 5.) The narrative to the itemization reflects that the taxes accrued after the filing of the 2005 Case. (Buck Ex. 9 at 5.) As an addendum to her Proof of Claim, Buck completed a *Mortgage Proof of Claim Attachment* that is required when the creditor asserts a "security interest in the debtor's principal residence." (Buck Ex. 9 at 6.) Buck treats the $3,506.68 in accrued real property taxes as "[p]rincipal due." (Buck Ex. 9 at 6.) The itemization reflects that there are no installment payments past due. (Buck Ex. 9 at 7.)

The October 21, 2002 "judgment" finally surfaced as an attachment to the Proof of Claim.[4] (Buck Ex. 9 at 24.) The "judgment" is actually termed an "Order" (hereafter "Judgment") and bears inclusion in substantial part.

### ORDER

Now on this 21st day of October, 2002, comes on for hearing the Complaint of the Plaintiff, Pamela Buck, and the Response of the Defendants, Roger Johnson and Threesa Johnson. Plaintiff appears in person and by and through her attorney, Phyllis J. Lemons, and the Defendants appear in person, pro se. This cause is submitted upon the pleadings filed herein, testimony of the parties and witnesses and exhibits and all other matters in the file and before the Court, from all of which the Court does find:

1. That this Court has jurisdiction of the subject matter and parties hereto.

2. That the Plaintiff and Defendants entered into a Contract of Sale of Real Estate on July 27, 1998, in which the Defendants agreed to purchase the following described real property located in Hot Spring County, Arkansas, to wit:

[legal description omitted]

3. The contract required the defendants, Roger D. Johnson, Jr. and Threesa A. Johnson, to insure the real property against unavoidable casualty. The defendants have failed to do so and at various periods of time the property has been uninsured. Obviously, this provision is essential and time is of the essence. Breach thereof creates a substantial risk of loss to the plaintiff.

4. The law does not favor forfeitures and in this case defendants have invested sums of money for improvements to the real properties over a period of approximately five years in addition to abiding by the other terms of the contract. This contract, therefore, is hereby treated as a mortgage and it is ordered said property be sold a[t] public auction within ninety (90) days from the date hereof by the Commissioner in the Circuit Court, Civil Division, to the highest bidder for cash. The proceeds of the sale shall be distributed according to law.

5. The defendants shall have the normal right of redemption.

---

3. The attachment to the breakdown reflects that C. Walthall's fees accrued after the 2005 Case.

4. The "judgment" was entered of record on November 6, 2002, but is dated October 21, 2002.

IT IS SO ORDERED.

/s/Honorable John W. Cole

(Buck Ex. 9 at 24–25.)

The Notice apparently revived the State Court Litigation, and the debtors faced the prospect of an immediate sale of their home as ordered in the previously dormant Judgment.

### 4. The Plan and Objection

The debtors have $200.45 in monthly net income. (Schedules 18, ECF No. 15.) The proposed Plan provides that the debtors will pay directly to the Chapter 13 Trustee $200.00 a month over thirty-six months to be distributed pro-rata to unsecured creditors. (Plan 1, 3, Feb. 23, 2012, ECF No. 17.) These provisions are the only substantive terms contained in the Plan. The Plan does not directly or indirectly provide any treatment for Buck. (Plan, ECF No. 17.) Buck objected to confirmation of the Plan. (Objection, Feb. 28, 2012, ECF No. 25.)

Buck's primary objection centers on her claim for payment of the real property taxes that accrued after the debtors filed their 2005 Case. Buck testified that, as the record owner of the real property, she receives the tax bill in March of each year for the prior year. Historically, she would divide that number by twelve and would notify the debtors by phone of any increase in the $9.00 a month payment provided for in the Contract. Buck would then pay the taxes. Buck stated that the 2003 real property taxes were the last taxes paid by the debtors. Buck did not contact the debtors during their 2005 Case because of her belief that she was not to contact them during the pendency of their bankruptcy. After the conclusion of their 2005 Case, she retained counsel to pursue the taxes accrued from 2004 forward, which occasioned the Notice and then the 2011 filing.

Mrs. Johnson concurred that she received no notice regarding tax increases during the pendency of the 2005 Case. Conversely, she directly contradicted Buck's testimony of a prior history of increased tax payments followed by telephonic notice from Buck. Mrs. Johnson testified that the taxes had, prior to 2005, always been $9.00 a month and that Buck never notified the debtors of any increase. However, Mrs. Johnson did testify that she knew there were occasions during the intervening years when the real property taxes increased, but she took no action in this regard. Mrs. Johnson did not consider the failure to pay taxes to be an event of default nor did she believe that the Contract permitted the accrual of interest.

Mrs. Johnson also stated that on one occasion she went to the assessor's office to pay the taxes, but Buck had already made the payment. Mrs. Johnson made a vague assertion that she did not think they owed anything because they had paid enough into their 2005 Case to cover everything. This assertion was not quantified in any way and is contradicted by the debtors' Schedule J in the 2005 Case, which reflected a separate $17.75 a month payment that included real property taxes. (Buck Ex. 3 at 18.) Accordingly, the ongoing and prospective real property taxes would not have formed part of the agreed Modification.

During the confirmation hearing, a new issue arose—whether the Note and Contract constituted a deed and mortgage under Arkansas law. During his examination, Joel G. Hargis ("Hargis"), the debtors' trial attorney, used mortgage terminology when referring to the Note and Contract. In referring to Buck, Hargis stated, "the mortgagee—the seller[.]" (Hrg. Tr. 10, July 6, 2012.) In cross-examining Buck, Hargis inquired, "I'm reviewing the note—excuse me—I'm reviewing the mortgage.

Your mortgage contemplates—well, excuse me—your contract contemplates an increase in taxes?" (Hrg. Tr. 35.) On direct examination of Mrs. Johnson, Hargis asked, "[u]p until your 2005 bankruptcy, did you make your payments to Ms. Buck under the mortgage that paid your property taxes?" (Hrg. Tr. 42.) On redirect of Mrs. Johnson, Hargis asked, "[w]hose duty under the mortgage—excuse me—whose duty under the contract was it that—whose duty under the contract was it to notify either party of any increase in taxes?" (Hrg. Tr. 58.)

The court inquired as to whether, in practical effect, the debtors conceded that the Note and Contract represented a deed and mortgage transaction in a manner acceptable under Arkansas law. In response to the court's inquiry, Hargis stated:

My response, Your Honor, is that it is a contract for land. And I would assert that the proof of claim, Plaintiff's 9, that was filed in this present case identifies it as a contract of sale.

(Hrg. Tr. 70.)

The debtors, in their post-trial brief, further addressed the question of whether the Note and Contract represent a deed and mortgage transaction or simply a contract.

Based on the above research, it appears the Creditor's position is, that while the Creditor did not abide by the terms of the written contract, such is immaterial as she is now asking this Court to treat the "Contract For Sale of Real Estate" as a mortgage. The same is an awfully convenient position to take as a mortgage would suggest a lien on the real estate, while a contract for deed would not. In other words, at no time in the past did the Creditor construe the contract as a mortgage, but only when it *could or may* benefit her to define the document as a mortgage, in order to

shelter herself under the protection of 11 U.S.C. § 1322(b)(2), does she actually argue that the document in question is a mortgage, and not a contract for sale of real estate. Based on that theory, the Creditor has posited eight (8) arguments as to why she is entitled to be paid all real estate taxes that she incurred during the pendency of the Debtors' previous Chapter 13 case bearing case number 6:05–bk–71177.

If the Court determines the July 27, 1998 Contract for Sale of Real Estate to be a contract for sale of real estate, then none of the above 39 cases are applicable to the facts of this case because there is no lien of record to survive the discharge. If the Court determines the July 27, 1998, Contract for Sale of Real Estate to be a mortgage, then none of the above cases are applicable, because any lien claimed by the Creditor is not perfected, and is avoidable by the United States Chapter 13 Trustee pursuant to 11 U.S.C. § 544. Moreover, even if this court were to define the document as a mortgage, the Creditor's arguments still fail as *United Student Aid Funds, Inc. v. Espinosa* [— U.S. ——], 130 S.Ct. 1367 [176 L.Ed.2d 158] (U.S.2010) is determinative, and will be discussed in more detail below.

(Debtors' Br. in Resp. to Creditor's Post Trial Br. 2, Aug. 17, 2012, ECF No. 67.) The debtors' post-trial assertions are inconsistent with the debtors' treatment of Buck as a secured mortgage lender in their 2005 Case.

### III. Discussion

#### A. *Objection and Response*

In her Objection, Buck raised five bases for denial of confirmation. Three of the five grounds—failure to incorporate the terms of the Contract and Note, failure to

provide proof of physical damage insurance, and inclusion of "global notes" inconsistent with or not authorized by the Code and Rules—were raised in Buck's Objection but not mentioned at trial. (Objection 2, ECF No. 25.) Without evidence in the record regarding these grounds, Buck's request for relief on these bases is denied.[5]

Buck raised two other grounds in her Objection that were tried. Both relate to the debtors' failure to mention or provide for Buck's claim in their contemplated Plan. Specifically, Buck pled as follows:

(D) The value, as the effective date of the plan, of the property to be distributed under the plan on account of this creditor's claim, is less than the allowed amount of such claim;

(E) The plan is not feasible in that the plan payments are insufficient to provide distributions to this creditor in equal monthly installments sufficient enough to provide adequate protection.

(Objection 2, ECF No. 25.)

In response, the debtors posit three theories that they argue compel confirmation of their Plan as written and justify additional relief as set forth below. The debtors' three arguments can be summarized as follows: (1) that the Contract is merely a contract for the sale of real property and there is no lien of record to survive the discharge; (2) if the Contract is, in fact, a mortgage, then Buck's lien is not perfected and thus avoidable; or, (3) regardless of how you characterize the transaction, the confirmed plan in the 2005 Case formed a new contract binding both the debtors and Buck, and the debtors' performance under that plan discharged all their indebtedness to Buck.

In addition to requesting confirmation of their Plan as proposed, the debtors now seek additional relief not set out in their Plan or any pleading other than their post-trial brief. Arguing that the Contract "is a contract, and it has never been treated or acknowledged as a mortgage until this contested matter[,]" the debtors now ask the court to declare them the "owners of the real estate in question," overrule Buck's Objection, disallow her claim in its entirety, and award costs and attorney's fees. (Debtors' Br. 11, ECF No. 67.)

### B. Denial of Confirmation

■ The analysis of these issues will benefit from the appropriate elimination of two extraneous issues. First, the court must resolve the issue of whether the Note and Contract may be treated as a deed and mortgage transaction under Arkansas law. The debtors now insist that the transaction may not, that the relationship is merely contractual, and that Buck does not enjoy the status of a secured creditor. (Debtors' Br. 11, ECF No. 67.) However, in addition to the significant body of Arkansas law that frequently characterizes these transactions as a deed and mortgage relationship, it is abundantly clear that the debtors in their 2005 Case—the consequences of which form the entirety of the debtors' current argument—treated the relationship as a deed and mortgage transaction.

Specifically, in the 2005 Case, the debtors listed their interest in the home as "own[ed]" with a secured claim of $11,000.00. (Buck Ex. 3 at 1.) The debtors listed Buck as the secured creditor on Schedule D. (Buck Ex. 3 at 8.) In the "Nature of Lien" category, the debtors typed in "Purchase Money." (Buck Ex. 3 at 8.) Under "Collateral," the debtors re-

---

5. One exception is that the debtors, in their post-trial brief, suggested that they have withdrawn the offensive "global notes." (Debtors' Br. 8, ECF No. 67.) It is, however, not clear that the debtors have taken any affirmative steps to withdraw this language.

sponded, "4–bdrm house & 2.9 acres." (Buck Ex. 3 at 8.) The debtors exempted the real property on their Schedule C. (Buck Ex. 3 at 6.) The Contract is not listed or referenced as an executory contract on their Schedule G. (Buck Ex. 3 at 15.) In their initial plan proposed in the 2005 Case, the debtors treated Buck in the category of fully secured creditors who would "retain their liens and be paid the value of their collateral[.]" (Ch. 13 Plan 2, ECF No. 13.) The debtors' Modification in the 2005 Case was done to "accept creditor Pamela Buck's Proof of Claim[.]" (Buck Ex. 2 at 1.) In Buck's 2005 Claim, she listed herself as a fully secured creditor collateralized by real property. (Buck Ex. 1 at 1.) The Judgment, entered prior to the 2005 Case, characterized the transaction as a mortgage relationship. (Buck Ex. 9 at 25.)

The debtors, in their 2005 Case, asserted both ownership of the property and acknowledged and treated Buck as a fully secured creditor. If otherwise, then the debtors preferred an unsecured creditor to the detriment of their other creditors. On their schedules in the 2011 Case, the debtors again state that they own the property without any recognition that legal title is still vested in Buck. (Schedules 1, ECF No. 15.)

In both of their pertinent bankruptcy cases, the debtors have claimed present ownership of the property. In their 2005 Case, they afforded Buck the status of a fully secured creditor as a mortgagee. (Ch. 13 Plan 2, ECF No. 13.) Now, the debtors seek to characterize the relationship in an entirely different light. They are judicially estopped from doing so. *See New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (defining the doctrine of judicial estoppel to encompass "[w]here a party assumes a certain position in a legal proceeding, and

succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him[ ]" ... to prevent "a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase") (citations omitted). *See also Knigge v. SunTrust Mortg., Inc. (In re Knigge)*, 479 B.R. 500, 507 (8th Cir. BAP 2012) (noting that the legal doctrine of judicial estoppel, which "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase," "protects the integrity of the judicial process") (citations omitted).

Applying the doctrine of judicial estoppel, the debtors cannot now ignore the basis of their 2005 plan and their current assertion of legal ownership of the real property on the misplaced belief that there is some benefit in doing so. Accordingly, this court disregards all arguments based on any distinction between a contract for the sale of real property versus a warranty deed and mortgage transaction.

Second, this matter is further complicated by the court's uncertainty of whether Buck is proceeding on the Judgment that was referenced in her 2005 Claim, the Note and Contract, or a combination of both. Buck appears to want the benefits of the Note and Contract, but she has, in the State Court Litigation, enjoyed the hammer of a "judgment" that treats the transaction as a mortgage by which she can sell property she owns in fee to extinguish a debt to herself. Given that Buck has historically treated the parties' relationship as a deed and mortgage transaction, and the debtors have done the same, the court will deal with this matter as a deed and mortgage transaction on the

debtors' principal residence unaffected by the Judgment.[6]

The elimination of those two issues reduces the parties' arguments to its essence. Buck argues that the debtors still owe her real property taxes, attorney's fees, and accrued interest based on the Note and Contract. The debtors argue that confirmation of their 2005 plan and the discharge in their 2005 Case relieve them of any obligation to Buck under the Note and Contract. Two bases, however, compel denial of confirmation of the Plan as proposed.

### 1. *Espinosa* and *Burnett*

The debtors assert that the confirmed plan in their 2005 Case is res judicata and has the effect of discharging the indebtedness set forth in Buck's Proof of Claim. While the confirmed plan does have a res judicata effect, the effect is not as broad as the debtors suggest.

Section 1322(b)(2) permits the modification of the rights of holders of secured claims, "other than a claim secured only by a security interest in real property that is the debtor's principal residence[.]" 11 U.S.C. § 1322(B)(2) (2012). This provision is tempered by section 1322(b)(5), which permits the curing of arrearages within a reasonable time on debts that extend past the contemplated final payment under the plan. Home mortgage transactions in a Chapter 13 typically fall in this category. In this instance, the record is unclear if the April 25, 2005 order and subsequent Modification contemplated or included arrearages. The only specific testimony in this regard is from Buck who stated that the $22,120.32 amount included principal and interest only. Buck did not itemize any arrearages on her 2005 Claim. The limited proof reflects that no arrearages

were involved in the 2005 Claim and the Modification.

Section 1322(c)(2), however, deals with home mortgage transactions where the final payment under the original payment schedule is due before the conclusion of the anticipated final plan payment. This section provides as follows:

> (c) Notwithstanding subsection (b)(2) and applicable nonbankruptcy law—
>
> . . . .
>
> (2) in a case in which the last payment on the original payment schedule for a claim secured only by a security interest in real property that is the debtor's principal residence is due before the date on which the final payment under the plan is due, the plan may provide for the payment of the claim as modified pursuant to section 1325(a)(5) of this title.

11 U.S.C. 1322(C)(2) (2012). While the record is not entirely clear on this point, it appears that the debtors in their 2005 Case did in some way modify the rights of the secured creditor. For example, assuming no allocation to arrearages, the monthly payment went from $286.85, as per the Note, to at least $305.56, as per the proposed 2005 plan. (Buck Ex. 5 at 1; Ch. 13 Plan 2, ECF No. 13.) The record is unclear whether that figure increased by virtue of the Modification, which is not specific to Buck but only general as to the total payment to the Chapter 13 Trustee. (Buck Ex. 2 at 1.) Buck, as reflected by the order sustaining her objection, agreed to her treatment under the plan, a permissible option for a secured creditor under section 1325(a)(5)(A). (Stip. Ex. 2.) The Modification "accept[ed]" Buck's 2005 Claim in the amount of $22,120.32, which facially included no arrearages. (Buck Ex. 2 at 1.) Buck testified that the 2005 Claim

---

**6.** It is unclear from the record and the respective positions of the parties how to quantify the consequences, if any, of section 1322(c)(1).

included only principal and interest and that the debtors were then current in their payments to Buck for the real property taxes.

In their post-trial brief, the debtors argued:

As to the issue of the debt owed to the Creditor being a post-petition debt and not dischargeable in a chapter 13, the confirmed Plan stated a fixed price to be paid that would be paid by the Debtors to completely fulfill the terms of the Contract for Sale. To be clear, the original contract *contemplated* the property taxes while the *agreed to* amended and confirmed plan left those terms out. Additionally, that fixed price was set by the Creditor when she filed her proof of claim. The Creditor neither disclosed that the Debtor would not be able to complete the terms of the Contract, by completing the confirmed Plan, nor that there were other ongoing obligations that were to be paid during the term of the confirmed Plan. The Debtor relied on the proof of claim submitted by the Creditor, and calculated the amount necessary to pay into the plan to complete the terms of the contract as specified by the Creditor in the proof of claim. Indeed, the Creditor objected to the original Plan, thereby, participating in the case; required additional terms that would have allowed for the payment of the contract in full through the terms of the confirmed plan; never filed an amended proof of claim, and never provided a notice of any increase to the Debtors or Trustee that needed to be paid to fulfill the terms of the contract.

(Debtors' Br. 9, ECF No. 67.) (emphasis in original).

The debtors further argued that the debt to Buck is discharged based on *United ed Student Aid Funds, Inc. v. Espinosa,* — U.S. —, 130 S.Ct. 1367, 176 L.Ed.2d

158 (2010) and *Burnett v. Burnett (In re Burnett),* 646 F.3d 575 (8th Cir.2011).

The debtor in *Espinosa,* prior to filing bankruptcy, obtained several federally guaranteed student loans. 130 S.Ct. at 1373. In his subsequent Chapter 13 proceeding, the debtor proposed in his plan to repay only the principal of his student loan debt, stating that the remainder in the form of accrued interest would be discharged on payment of the principal. *Id.* at 1374. The student loan creditor was notified of the plan; Espinosa did not file an adversary proceeding—the appropriate route to discharge student loan debt under 11 U.S.C. § 523(a)(8). *Id.* The student loan creditor filed a proof of claim representing both the principal and accrued interest but did not object to the plan's proposed discharge of the interest amount without a determination of undue hardship. *Id.* The debtor's plan was confirmed, and the debtor made the scheduled payments of principal but not interest. *Id.* Thereafter, the student loan creditor sought to collect the unpaid interest on the student loans. *Id.*

The Court dealt extensively with the issues of due process and Federal Rule of Civil Procedure 60(b)(4) in the context of 11 U.S.C. § 523(a)(8). The Court rejected the creditor's arguments in this regard, noting that the "[b]ankruptcy [c]ourt's failure to find undue hardship before confirming Espinosa's plan was a legal error . . . . [b]ut the order remains enforceable and binding on United because United had notice of the error and failed to object or timely appeal." *Id.* at 1380. The Court afforded the confirmation order the status of a final judgment. *Id.* at 1376.

Applying *Espinosa,* immediate distinctions are apparent. The plan in the 2005 Case makes no mention of a "fixed price" as now argued by the debtors. The 2005 plan contained no specific reference to un-

paid future accruals of real property taxes or attorney's fees. Additionally, the record lacks any testimony or evidence that the agreement of the parties and the subsequent Modification encompassed the accrual of post-petition real property taxes or attorney's fees. Another, and arguably more important, distinction concerns the time that the disputed debt arose. The three elements of indebtedness set out in Buck's Proof of Claim in the 2011 Case all arose post-petition in the context of the 2005 Case. *Espinosa* dealt with pre-petition debt and accrued interest. *Id.* at 1373.

The 2005 Claim did not include arrearages, and the debtors were current in their pre-petition tax obligations to Buck. (Buck Ex. 1.) The debtors' argument that the Modification must have included post-petition accruals of real property taxes is inconsistent with their own 2005 Schedule J, wherein they indicated that real property taxes were not included in the monthly mortgage payment and, commensurately, itemized a separate monthly payment of $17.75 inclusive of real property taxes. (Buck Ex. 3 at 18.) In fact, on the same day that the debtors filed their Modification, they also modified their Schedule J and reiterated that the mortgage payment did not include real property taxes and again line-itemed the $17.75 monthly amount for the payment of taxes inclusive of real property taxes. (Buck Ex. 2 at 6.) Notwithstanding that itemization, the debtors did not thereafter pay the real property taxes either to Buck or Hot Spring County.

The Eighth Circuit Court of Appeals has addressed a similar issue post-*Espinosa*. In *Burnett*, the debtor reached a divorce agreement that contained a provision paying his ex-wife $750.00 per month for child support and alimony. *Burnett v. Burnett (In re Burnett)*, 646 F.3d 575, 576 (8th Cir.2011). The agreement was vague as to what percentage would serve as child support and what percentage would serve as alimony/spousal support. *Id.* Burnett "became delinquent in his monthly payments, and over time amassed a substantial arrearage" in the "principal sum of $57,402.70." *Id.* Burnett and his ex-wife went back to state court attempting to resolve the issue of outstanding interest. *Id.* While that issue remained unresolved, Burnett filed a Chapter 13 proceeding. *Id.* at 577.

Burnett and his ex-wife reached an agreement, which the bankruptcy court approved. *Id.* The agreement provided:

> [Burnett] will modify his plan to provide for payment of $300.00 per month for the allowed claim of $57,402.70 over the life of the plan. Once the plan is concluded and the bankruptcy action is terminated, [Burnett] will continue to pay the sum of $300.00 per month toward the balance of the allowed claim until the debt is satisfied in full.

*Id.*

The agreement went on to reserve, to each party, the right to litigate in state court "the issue of accrued interest on the support arrears." *Id.* The difficulty arose when the actual modified plan, to which the ex-wife did not object, included the adjective "child" before the word "support," seemingly limiting any future action to determine interest solely on child support. *Id.* Burnett's ex-wife went back to state court and obtained a ruling that resulted in a withholding in excess of $300.00 a month against Burnett's income. *Id.* at 578. The withholding was based on a combination of both child and spousal support. *Id.* In reaction, Burnett moved to reopen his Chapter 13 case in order to ask the court to hold his ex-wife in contempt. *Id.* The bankruptcy court refused to hold the ex-wife in contempt but did conclude that

the state court "order contravened the confirmed bankruptcy plan" in that it resulted in a payment obligation exceeding the $300.00 per month repayment schedule stated in the plan. *Id.*

The Bankruptcy Appellate Panel for the Eighth Circuit Court of Appeals ("BAP") reversed the lower court. *Id.* at 579. As characterized by the Eighth Circuit in *Burnett,*

> [t]he BAP resolved that "the ultimate issue to be decided is whether the confirmed plan prevents Ms. Burnett from collecting more than $300.00 per month on *any obligation* Debtor may owe to her" and "conclude[d] that Ms. Burnett's right to collect accrued interest and to be paid any post-petition domestic support obligations were not limited by the confirmed plan." (Emphasis added.) In reaching this conclusion, the BAP noted that Mr. Burnett's "plan only dealt with the principal amount of the support arrearage claim held by Ms. Burnett as of the date of the bankruptcy filing" and "specifically did not address any claim which was awarded post-petition, namely, the interest due to Ms. Burnett."

*Id.*

The Eighth Circuit affirmed the BAP decision in part and reversed in part. *Id.* at 576. In considering section 1327(a) and the effect of confirmation, the court concluded that the confirmed plan was res judicata and barred the attempt by Burnett's ex-wife in the state court proceeding "to expand her entitlement to relief to include interest on her pre-petition *spousal* support." *Id.* at 581 (emphasis in original). Conversely, the court stated:

> As for Ms. Burnett's remaining claims for post-petition child and spousal support, and interest thereon, the BAP correctly ruled that these claims are be-

yond the purview of Mr. Burnett's plan, and the Bankruptcy Court's jurisdiction. *Id.* at 582.

Accordingly, the Eighth Circuit reversed the BAP's ruling awarding Burnett's ex-wife interest on her pre-petition spousal support but affirmed the ex-wife's entitlement to recover post-petition domestic support obligations and permitted her to do so through an income withholding that exceeded the $300.00 amount set forth in Burnett's confirmed plan. *Id.*

Buck's 2005 Claim did not include any arrearages and, of course, did not include real property taxes from 2004 through 2010, nor attorney's fees accrued post-petition. (Buck Ex. 1.) Buck testified that the 2005 Claim included principal and interest only. The debtors' original Schedule J and their amended Schedule J, filed on the same day as the Modification, reflected a monthly expense that included real property taxes. (Buck Ex. 3 at 18; Buck Ex. 2 at 6.) Despite that itemization, the debtors did not make the payments, and post-petition debt has accrued. The res judicata effect of the confirmed plan in the 2005 Case does not preclude Buck from seeking post-petition and post-confirmation accruals under the terms of the Note and Contract. For this reason, the Objection to the proposed Plan is sustained.

### 2. Good Faith

■ The debtors' Plan has not been proposed in good faith as required by 11 U.S.C. § 1325(a)(3). Buck did not specifically raise this ground in her Objection; however, this court may determine on its own that a plan does not comply with the applicable provisions of the Code. As stated in *Espinosa,*

> [f]ailure to comply with this self-executing requirement should prevent confirmation of the plan even if the creditor fails to object, or to appear in the proceeding at all. That is because

§ 1325(a) instructs a bankruptcy court to confirm a plan only if the court finds, *inter alia*, that the plan complies with the "applicable provisions" of the Code. 130 S.Ct. at 1380–81 (citations omitted).

 The obvious and inherent deficiencies in the debtors' Plan invite scrutiny and compel denial of confirmation. When the debtors filed their 2011 Case, they were very much aware of an ongoing dispute with Buck concerning the Note and Contract. Buck had already informed the debtors that she had a claim against them for accrued real property taxes and attorney's fees. The debtors knew that Buck owned their home in fee and had not deeded the property to them. The debtors also knew that the Judgment had been entered of record in 2002, had lain dormant, and was in the process of being revived in late 2011. Buck's effort in that regard is the exclusive reason the debtors filed the 2011 Case.

Despite that knowledge, the debtors' schedules, Plan, and post-trial brief reflect that the debtors have chosen to inaccurately portray, or completely ignore, their relationship with Buck. They listed and exempted the real property as owned free of any lien or encumbrance even though they knew that title resides with Buck, who contends that she has a lien and interest in the property securing a balance owed. (Schedules 1, 4, 11, ECF No. 15.) Further, the debtors make no reference to the Judgment entered of record directly related to the real property. (Schedules 4, ECF No. 15.)

In their 2005 Case, the debtors on Schedule J itemized a monthly payment of $17.75 for real property and personal property taxes. (Buck Ex. 3 at 18.) The debtors did not, however, at any time during the course of their earlier bankruptcy actually make the real property tax payment. In fact, the same Schedule J in the 2005 Case, while not reflecting a home mortgage payment, discloses that real property taxes are not included in the omitted figure. (Buck Ex. 3 at 18.) Clearly, from the inception of their 2005 Case forward, the debtors were not including the real property taxes in their payments to Buck but failed to make the payments themselves. This pattern carries over into the present case where the debtors, while omitting a monthly mortgage payment figure on their Schedule J, indicate that the omitted figure includes real property taxes. (Schedules 13, ECF No. 15). Yet, the debtors are not making a monthly mortgage payment, reimbursements to Buck for real property taxes, or direct payments to Hot Spring County for the real property taxes.

Prior to filing their 2011 Case, the debtors knew Buck had a claim, one which they disputed. Still, they chose to ignore her status as a creditor. On their Schedule F, the debtors simply dispute that Buck is the "actual holder of the underlying debt instrument allegedly secured by the subject collateral and reserve the right to challenge the secured status of any party who claims to be a secured creditor and a holder of any such instrument as of the petition date." (Schedules 11, ECF No. 15.) Buck is unquestionably the holder of the Note. The debtors made payments to her as a secured creditor in their 2005 Case, and they knew that Buck was claiming unpaid real property taxes and attorney's fees. Thus, there is no question that Buck is a creditor.

Additionally, despite consistently treating Buck as the secured creditor on their home and paying her on that basis in the 2005 Case, the debtors now completely reject that characterization based on a perceived opportunistic benefit in their new bankruptcy case. Their rejection of the entire basis of their own plan in the 2005

Case alone is sufficient bad faith to deny confirmation.

Further, the debtors know Buck has record title to the property, yet they chose to list the property as theirs. Despite the reference to a "possible claim" against Buck on their Schedule B, the debtors never initiated an adversary proceeding or took any other action to actually obtain title in their name. (Schedules 4, ECF No. 15.) The Plan simply proceeds on the premise that title rests with the debtors and that no obligations, disputed or otherwise, exist relative to their purchase of the property. The record simply does not indicate any plan or methodology that would permit the debtors to emerge owning their own home in fee simple. This disjunct with reality continues on their Schedule J, where the debtors neglect to itemize any amount for either a monthly or yearly real property tax payment, despite supposedly owning the property free and clear of any liens or encumbrances. (Schedules 18, ECF No. 15.) Apparently, the debtors have elected to simply ignore the issues of actual ownership and ongoing real property taxes, inclusive of taxes accruing since 2004.

This court's independent review of the debtors' Plan reveals omissions, mischaracterizations, and deficiencies that collectively compel denial of confirmation pursuant to 11 U.S.C. § 1325(a)(3).

### C. Attorney's Fees and Deed

■ Kathy Cruz ("Cruz") represented the debtors in this bankruptcy case. Cruz secured the services of Hargis for the confirmation hearing. Hargis filed an *Entry of Appearance and Request for Notices* one day prior to appearing in the case for the first time at the confirmation hearing. (Entry of App. and Req. for Notices, July 5, 2012, ECF No. 53.)

In their post-trial brief, the debtors requested costs and attorney's fees pursuant to Ark.Code Ann. § 16–22–304. (Debtors' Br. 8, ECF No. 67.) The Arkansas Code section cited appears to be more in the nature of an attorney's lien statute and is inapplicable. Further, and more dispositive, the *Disclosure of Compensation of Attorney for Debtor* filed in this case reflects that Cruz accepted the $3,000.00 "no look" fee traditional in this jurisdiction. (Schedules 37, ECF No. 15.) Paragraph 5 of the disclosure reflects that her representation includes appearing at any confirmation hearing. (Schedules 37, ECF No. 15.) Cruz's election to bring in another attorney without application, declaration, or court approval does not alter the incidents of the "no look" fee. The request for fees is denied.

Additionally, the debtors, in their post-trial brief, asked this court to declare the debtors to be the owners of the real property in question. (Debtor's Br. 11, ECF No. 67.) Such a finding ignores the State Court Litigation and, procedurally, appears to be a request for declaratory relief or specific performance. Raising that issue in a post-trial brief is not appropriate procedurally or substantively; accordingly, no ruling is made in that regard.

### IV. Conclusion

The Objection is sustained. The debtors shall have thirty days from the entry of this order within which to file an amended plan. Should they choose not to do so, an order to show cause why this case should not be dismissed will issue.

IT IS SO ORDERED.